IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

JEFFREY J. GORMAN,           )
                             )
            Plaintiff,       )
                             )
      v.                     )   Case No. 08-0663-CV-W-REL-SSA
                             )
MICHAEL ASTRUE, Commissioner )
of Social Security,          )
                             )
            Defendant.       )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Jeffrey Gorman seeks review of the final decision
of the Commissioner of Social Security denying plaintiff's
request for a waiver of recovery of overpaid disability benefits.
I find that plaintiff is not entitled to waiver.  Therefore,
plaintiff's motion for summary judgment will be denied and the
decision of the Commissioner will be affirmed.

## I.  BACKGROUND

On August 3, 2001, plaintiff applied for a period of
disability and disability insurance benefits, and his application
was granted with a period of disability beginning on November 28,
2000.  Plaintiff was found disabled based on a fracture of the
vertebral column that resulted in paraplegia which met Listing
11.08A.  On March 24, 2006, SSA notified plaintiff that he no
longer qualified for disability benefits.  His trial work period
ended July 2002, and his extended period of eligibility was
August 2002 through July 2005.  Plaintiff was overpaid

$48,816.30. He submitted a request for wavier of recovery of overpayment on May 31, 2006, alleging that the overpayment was not his fault and he could not afford to repay the money. On July 15, 2006, and again on September 5, 2006, plaintiff was notified that his request for waiver was denied. Plaintiff requested a hearing before an ALJ. That hearing was held on August 17, 2007. The ALJ issued a decision on August 31, 2007, finding that plaintiff was not without fault and that recovery of the overpayment could not be waived. On June 17, 2008, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. *STANDARD FOR JUDICIAL REVIEW*

The standard for judicial review by this court is whether the decision of the Commissioner regarding plaintiff's "fault" was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Coulston v. Apfel, 224 F.3d 897, 901 (8th Cir. 2000); Osborn v. Bowen, 794 F.2d 385, 387 (8th Cir. 1986). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951). "The Court must also take into consideration the weight of the

evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1992); McMillian v. Schweiker, 697 F.2d 215, 220 (8th Cir. 1983).

### III. THE RECORD

The record consists of the testimony of plaintiff in addition to documentary evidence admitted at the hearing.

### A. SUMMARY OF TESTIMONY

During the May 17, 2007, hearing, plaintiff testified as follows:

Plaintiff was originally disabled in January 1988 (Tr. at 327). Afterward, he went to school and finished his degree (Tr. at 327). Plaintiff went to work and then got laid off from his job as a medical sales representative in November 2000 (Tr. at 328). Plaintiff then applied for disability benefits alleging disability as of November 28, 2000 (Tr. at 328). Plaintiff had exhausted his unemployment benefits so he went to the SSA office to see if he could qualify for disability benefits (Tr. at 331).

Plaintiff told the representative there that he was going back to work, but at the time he did not have a job so he wanted to know what his options were (Tr. at 332). The representative referred him to a manager (Tr. at 332). He told plaintiff that due to his work history, he was entitled to considerably more than SSI (Tr. at 332). He told plaintiff he could be put into a program where he could go to work and earn as much money as he could and still receive benefits (Tr. at 333). Plaintiff told the manager he was going to go back into medical sales (Tr. at 333). The manager offered plaintiff a job at SSA, but plaintiff said he wanted to work in outside sales (Tr. at 333). The manager told plaintiff that with SSI, he would lose his benefits if he earned too much money, but that there was another program where he could use his benefits to purchase equipment for a future job (Tr. at 333). The manager told the representative to sign plaintiff up for that program (Tr. at 333). The representative, Ms. Larkin, filled out the paperwork and told plaintiff to make sure all the information was correct and sign it (Tr. at 333).

The manager had explained to plaintiff that it would take a while for the SSDI to kick in, but he could begin getting SSI immediately[1] (Tr. at 334). However, no one explained any

---

[1] A disabled person may qualify both for SSDI under Title II of the Social Security Act and for SSI under Title XVI of the Act. Eligibility for SSDI depends on the insured person's contributions and insured status, 42 U.S.C. § 423(a)(1), (c)(1); SSI provides a minimum income for disabled people based on need,

procedures to plaintiff, and he did not know anything about the reporting procedures which are listed in the application on page 2 (Tr. at 334). Plaintiff testified that although he is a college graduate, he did not read his own application for benefits (Tr. at 334). The application included the following, "I agree to notify the Social Security Administration . . . if I go to work, whether as an employee or a self-employed person." (Tr. at 335). When Ms. Larkin asked him to sign the form, plaintiff made sure his name, social security number, and address were correct (Tr. at 336). He did not look at the other pages of the application because he did not know what parts of it applied to him and what did not (Tr. at 336).

The ALJ explained to plaintiff that he met a listing because he was paralyzed and not working, and that is why he was granted benefits (Tr. at 338). Because plaintiff went to work, he no longer met the requirements of disability because step one of the sequential analysis requires that the person not be employed at the substantial gainful activity level (Tr. at 338-339). The ALJ informed plaintiff that in order to waive the overpayment, he would have to find that plaintiff is without fault in causing the overpayment and that plaintiff does not have the funds to repay

42 U.S.C. § 1382(a)(1), (c)(1). In determining a person's eligibility for SSI, the agency considers his resources and any income received during the relevant quarter. Such income may include any SSDI benefits received during that period.

the overpayment, in whole or in part, either by lump sum or monthly payments (Tr. at 340). In order to find that plaintiff is without fault, the ALJ would have to find that plaintiff reported that he returned to work (Tr. at 340).

Plaintiff testified that he "eventually" filled out a work activity report (which is sent to disability recipients annually) (Tr. at 341). Plaintiff was not able to take care of the work activity report right away because he was working (Tr. at 351). He eventually went in to the SSA office without the form and asked the person at the front to check to see what information was needed from him (Tr. at 351). Plaintiff testified that someone pulled him up in the computer and said the action, whatever it was, had been halted (Tr. at 351). Within a week plaintiff got a letter stating that SSA had reviewed his record and he is entitled to more benefits (Tr. at 352). That happened again a year later (Tr. at 352). Plaintiff said he "assumed" SSA knew he was working because he told them he was going to be going back to work (Tr. at 341). Although he was not actually working when he said this, he testified that it was not clear to him that he had to report to SSA when he got a job (Tr. at 342). He did not complete a work activity report until the he received the third one from SSA (Tr. at 352). When he went in to talk to them about it, they told him to disregard it (Tr. at 352). Plaintiff said this is what happened each time he went in; and after he was

told to disregard the form, he received a letter saying his benefits were increasing (Tr. at 353).

Plaintiff thought he was signing up for SSI but learned he was getting SSDI[2] (Tr. at 343-344). The ALJ read from the letter plaintiff submitted as evidence, and that letter stated, "Amount due each month, $0.00. . . . You have monthly income which must be considered in figuring your eligibility as follows: Your Social Security benefits, before deductions for Medicare premiums, if any, of $956 for October 2001 on." (Tr. at 344).

During 2002, 2005, and 2006 -- the years of the overpayment -- plaintiff worked in the call center at Gateway Computers (Tr. at 326). When people called in after having seen an advertisement, plaintiff would help them purchase a computer (Tr. at 327). In November 2005, plaintiff tore his rotator cuff and began receiving short-term disability benefits (Tr. at 326). That went into long-term disability which he receives from Met Life (Tr. at 326). Plaintiff did not work at all in 2006 (Tr. at 326).

### B. ADMINISTRATIVE REPORTS

Plaintiff was born in 1967 (Tr. at 272). According to his testimony on May 17, 2007, he was originally determined to be disabled and eligible to receive Supplemental Security Income ("SSI") benefits under Title XVI in January 1988 due to injuries

---

[2]See footnote 1.

he sustained in a motor vehicle accident (Tr. at 327, 331). He returned to school and completed work for his degree (Tr. at 327). Plaintiff was employed until November of 2000 when he was laid off from his job as a district sales manager (Tr. at 101, 328).

The application for Title II benefits, which plaintiff signed on August 31, 2001, included the following language: "I agree to notify the Social Security Administration . . . if I go to work whether as an employee or a self-employed person" (Tr. at 273). Approximately three months after plaintiff was awarded benefits, he obtained employment with the Gateway Corporation, as a telephone customer service representative[3] (Tr. at 85-87). He did not notify SSA of this return to work (Tr. at 56). Indeed, plaintiff denied performing substantial gainful activity during the period in question[4] (Tr. at 60). This is inconsistent with his earnings history, which shows the following:

    2001        $ 6,844.07

    2002        $23,965.25

---

[3]SSA sent a form to Gateway Professional LLC on February 7, 2006 (Tr. at 85). The form was returned indicating a beginning date of employment as November 5, 2001.

[4]In his request for hearing by an administrative law judge, plaintiff wrote, "I did not perform substantial gainful work activity during the period 11/02 - 7/05 - 2/06. therefore, I am not overpaid the said amount." (Tr. at 60).

2003         $83,366.66[5]

2004         $20,564.93

2005         $13,450.61

(Tr. at 139, 145, 150).

On April 26, 2004; August 31, 2004; and September 1, 2004, SSA sent letters to plaintiff seeking additional information regarding the money that had been reported to his earnings record in 2001, 2002, and 2003 (Tr. at 205-07). In each instance, SSA provided plaintiff with a copy of the pamphlet "Working While Disabled . . . How Social Security Can Help" (Tr. at 205-07). In addition, plaintiff was asked to submit a report of work activity on an enclosed form and return it to SSA within 15 days (Tr. at 205-07).

In July 2005, plaintiff stopped working due to a torn rotator cuff (Tr. at 178). On January 20, 2006, judgment was entered in favor of plaintiff in the amount of $400,000.00 in litigation against the Ford Motor Company (Tr. at 129). On May 31, 2006, plaintiff filed a new application for disability insurance benefits (Tr. at 104-08). He reported that he became unable to work because of illness, injuries, or conditions on November 28, 2000 (Tr. at 104). He also submitted a "Work Activity Report - Employee" on May 31, 2006 (Tr. at 171-78). In

---

[5]It appears that not all of this amount was earned income but was instead the proceeds of a lawsuit (Tr. at 139).

that report, plaintiff was asked whether he spent any money of his own earnings for things or services related to his condition that allowed him to work, and he checked "no" (Tr. at 174).

In a Report of Contact dated July 25, 2006, SSA rep Ms. Bischof wrote:

> I spoke with Jeffrey J. Gorman on 7/25/06. He is very mad about everything. He is very unhappy with the Social Security Administration and all of the employees. Everything I tried to explain to him, he took offense and did not accept any explanation except what he wanted to understand and what possibly would be to his benefit.
>
> It appears from review of the file he never reported his wages to Social Security. He never completed the forms timely to notify Social Security of his work activity. On the forms he submitted after our request for information he did not show any work related expenses. The claims representative, Vicky Larkin, was the original worker that took his claim. I am positive she discussed the reporting responsibilities and the work related expenses to him. Her husband is in a wheelchair and she knows of the work related expenses that are involved. He has never indicated any expenses to Social Security. He purchased a 2002 car in 2004 and had it modified with hand brakes. He would not tell me when he modified the car nor how much it cost him to make the modifications (work related expenses). Therefore, the Administration could not take the work related expense under consideration.
>
> Mr. Gorman does not want to furnish information to Social Security about the large earnings in 2003 ($20,000) and 2003 ($40,000)[6]. It appears theses [sic] amounts were from two law suits. If this is true than [sic] the amounts are not considered earned income for Social Security substantial gaiinful [sic] work purposes. He would not give me information about these earnings.
>
> Claimant pulled the Social Security laws and regulations regarding against equity and good conscience. I wondered

---

[6]Both years are typed "2003". It is unclear what years should have appeared here (Tr. at 226).

why he never pulled the law regarding returning to work and
his reporting responsibilities.  He has 4 or more years of
college.  He did not want to discuss his income and
expenses.  He only wanted me to waive the overpayment due to
"against equity and good conscience".  He felt I should just
waive the overpayment, whether or not the overpayment was a
true overpayment or whether is [sic] was correct or wrong in
the amount.

I really wonder if the overpayment is a true overpayment.
If he had work related expenses he may not have earned wages
that were SGA.  Since he would not answer my questions, I
cannot look at that issue.  He filed a recon[sideration
request] on the fact and amount of the overpayment and the
recon was affirmed.  He can file a hearing on the fact of
the overpayment.

I asked him if he reported his wages and he said no.  He
said according to the manager at Gatewayy [sic] Professional
LLC he would be able to work and earn as much and still get
his Social Security checks.  Apparently he relied on someone
else and not Social Security and apparently he "knew to
question" his return to work and if it would affect his
checks.  He just did not contact the appropriate agency --
Social Security.

He was notified that he got an increase in his check due to
the additional earnings.  This is true, SSA did release a
letter.  Our agency did refigure his rate each year to give
hin [sic] credit without investigating whether or not he
performed SGA.

The agency is at fault for letting the computer
automatically refiguring [sic] the rate without the safe
guards of investigating and stopping his checks timely.

He is also at fault because he did not report his earnings
as he agreed to do so on his application.  He still does not
want to discuss his earnings and expenses.

Just because Social Security did not work his case timely
does not relieve him of his reporting responsibilities.

It is felt, after the personal conference, that he shops
from office to office.  He has involved the office on
Independence Blvd., Kansas City, MO, the office on Euclid,
Kansas City, MO, and the office on Lee's Summit Rd.,
Independence, MO.  He did not report the earnings and has

not cooperated in furnishing information needed to take the correct action timely. He did not file his recon request timely but we processed it without the additional needed information.

He apparently will be getting another civil settlement in the amount of $400,000. We are unable to determine if this is workers compensation or what the settlement is about.

(Tr. at 226-227).

On September 13, 2006, SSA Rep Ms. D. Bischof wrote in a

Report of Contact:

Mr. Gorman called today. He yelled at me on the phone for 1 hour. Yes! I finally hung up on him because I could not take the verbal abuse any longer.

He upset me so much & misinterpreted whatever I said. He told me he could not trust a word I said so I told him I would put this remark in his file. "Don't trust a word I said." I finally told him that because I [was] tired of his verbal comments.

He stated he did not have any work related expenses & that he worked & earned over the substantial gainful amounts. He will not be filing a hearing request on the cessation of benefits due to SGA. He will not be returning the HA-501 that I mailed to him on 9/3/06.

Claimant would not review his income & expenses shown on the SSA-632. Since I was able to review the figures we are w/h [withholding] his full checks to recover the o/p [overpayment] from benefits requested under EXR provisions. It will not cause any hardship in full recovery of the o/p.

Fraud referral made to O.I.G. I mailed another HA-501 to him but it was blank.

(Tr. at 231-32).

By letter dated November 20, 2007, SSA verified that no

application for a Plan to Achieve Self-Support ("PASS") was ever

processed for plaintiff (Tr. at 303-08). It was not clear that

plaintiff had ever submitted such an application or was referred

to the program (Tr. at 303-08). To be eligible for PASS, the

individual must be eligible to receive SSI (Tr. at 307). An

individual receiving Disability Insurance Benefit ("DIB") may

participate if he sets aside all but $20 of his DIB benefits (Tr.

at 308). Plaintiff was not eligible for SSI at any time during

the relevant period.[7] There is no evidence that plaintiff ever

set aside any of his DIB benefits.

## IV.  FINDINGS OF THE ALJ

On August 31, 2007, the ALJ entered an order denying

plaintiff's request for waiver of overpayment (Tr. at 18-23).

With respect to plaintiff's fault or lack thereof, the ALJ stated

as follows:

> . . . The claimant testified Ms. Larkin told him to read
> the application, verify the information and sign it.  The
> claimant contradictorily testified that he read the
> application and didn't understand it, and that he didn't
> read the application. . . .  The claimant asserted that
> since he told them he was planning on going back to work,
> they should have known he did go back to work.  It is
> unclear by what means he believes SSA staff, whom he had
> told he did not even have a job offer, should have intuited
> he had gone back to work.
>
> . . .  In considering the claimant's argument that he signed
> the application but did not read it, the Administrative Law
> Judge notes the United States Court of Appeals for the
> Eighth Circuit has held that "where nothing in the record

---

[7]Although plaintiff received one SSI check in September
2001, he was thereafter informed that he was no longer eligible
for SSI benefits because his Social Security benefits were higher
than SSI could pay (Supplemental Exhibit 1 to plaintiff's reply
brief).

indicated [the] claimant was unable to read or understand reporting requirements, forms signed by him should have put him on notice about reporting responsibilities," . . . The claimant, who is a college graduate, first testified the form confused him. The specific language on page 2 of the application is,"I agree to notify the Social Security Administration: . . . -- If I go to work as an employee or a self-employed person." When asked what was confusing to him about this language, the claimant then stated he had not read it before signing it. Social Security forms generally are intended to be understandable to a person with a sixth grade education. The claimant returned to work approximately three months after he signed this form. When asked whether he had reported his return to work, he responded that it was not clear he needed to. He also stated that he did report his work activity and talked to Ms. Bischof. The undersigned notes that much of the claimant's dissatisfaction appears to be focused on Ms. Bischof and the processing of his waiver request; however, she did not get involved in his case until the overpayment was well under way, and the issue is whether the claimant was "without fault" in causing the overpayment.

. . . [T]he overpayment amount appears to have been increased by a 4-month delay caused by the claimant's failure to respond to SSA's April 26, 2004 request for information about his reported earnings from 2001 to 2003. In follow up correspondence dated August 31, 2004, SSA noted it had not received the requested information. The claimant therefore also is "not without fault" for that reason.

(Tr. at 21-22).

The ALJ found that because plaintiff was not without fault, the waiver analysis under the application regulations did not reach the issues of defeating the purpose of Title II or being against equity and good conscience. The ALJ also noted here that recovery of the overpayment would not defeat the purpose of Title II in that the file contains a case summary report which states that a Missouri court judgment for $400,000.00 was entered in the plaintiff's favor against the Ford Motor Company on January 20,

14

2006 (Tr. at 22, n. 1). With respect to the equity and good

conscience analysis, the ALJ stated:

> . . . [A]t the hearing, the claimant proposed an alternative waiver theory based on misinformation. Specifically, he asserted "when you receive erroneous information from an official source of the SSA, then you're automatically found without fault and it's against equity and good conscience." When asked what erroneous information he had received, the claimant responded, "I've got a whole file of stuff here." When asked to elaborate, he stated that when he applied for disability, it had not been made clear what he was supposed to do or what program he was in. The Administrative Law Judge notes the application he signed contains this information, and finds his alleged failure to read it is not "misinformation."

(Tr. at 22).

The ALJ found plaintiff's testimony not credible:

> Regarding credibility, the claimant, in person and by his written submissions of record, impresses the Administrative Law Judge as an intelligent young man who is well capable of understanding any and all of which he claims he does not understand or which confused him. The Administrative Law Judge finds the claimant's testimony is not fully credible, and further is unconvinced that his purposed "confusion" does not have a substantial manipulative element. The undersigned notes that the primary claims representative on the overpayment was Ms. Bischof, who on July 25, 2006, reported a phone call during which the claimant "did not accept any explanation except what he wanted to understand and what possibly would be to his benefit." Also, on September 13, 2006, Ms. Bischof reported a long and abusive phone call from the claimant in which he "misinterpreted whatever I said." The claimant's parting comment at the hearing was "that's another thing confusing I've gotten now." The Administrative Law Judge finds the claimant's testimony is not credible and that his view of this matter is skewed in a self-serving manner such that he basically has decided to understand what he wants to understand, and to be "confused" by what he does not want to understand, including anything that reasonably would lead to the conclusion that he is not "without fault" in causing the overpayment. The undersigned also finds it relevant to the claimant's credibility that he has a history of

uncooperativeness about providing financial information, and he did not respond to SSA's initial request for information in April 2004 about unreported work activity. At the close of the hearing, the Administrative Law Judge asked the claimant to submit an updated income and expenses form and comments about the findings in the underlying September 5, 2006 waiver determination, by Ms. Bischof. He agreed to do this, but did not submit anything or offer any explanation as to why he had chosen not to comply with the request.

The Administrative Law Judge finds no documentary or otherwise credible evidence that the claimant was misled or misinformed by SSA staff at the time he filed his application in August 2001, and finds no merit to the claimant's "against equity and good conscience" waiver theory based on his self-serving and otherwise unsupported allegations that he received misinformation.

(Tr. at 22-23).

## V.    ANALYSIS

When an individual is determined to have been overpaid disability benefits, but was not at fault in accepting the overpayment, recovery of overpayment can be waived. The recipient has the burden of demonstrating that he is entitled to a waiver. Coulston v. Apfel, 224 F.3d 897, 900 (8th Cir. 2000). Title 42, United States Code, Section 404 provides:

(b)    No recovery from persons without fault.
In any case in which more than the correct amount of payment has been made, there shall be no adjustment or recovery by the United States from any person who is without fault if such adjustment or recovery would defeat the purpose of this subchapter or would be against equity and good conscience.

Fault is defined in the regulations as follows:

. . .  In determining whether an individual is at fault, the Social Security Administration will consider all pertinent circumstances, including the individual's age and intelligence, and any physical, mental,

16

educational, or linguistic limitations . . . the
individual has.  What constitutes fault . . . on the
part of the overpaid individual . . . depends upon
whether the facts show that the incorrect payment to
the individual . . . resulted from:

    (a)   An incorrect statement made by the individual
           which he knew or should have known to be
           incorrect; or
    (b)   Failure to furnish information which he knew or
           should have known to be material; or
    (c)   With respect to the overpaid individual only,
           acceptance of a payment which he either knew or
           could have been expected to know was incorrect.

20 C.F.R. § 404.507.

    The regulations also state:

    The benefit payment . . . to . . . an individual who fails
to meet one or more requirements for entitlement to such
payment . . . constitutes an entitlement overpayment.  Where
an individual . . . accepts such overpayment because of
reliance on erroneous information from an official source
within the Social Security Administration . . . with respect
to the interpretation of a pertinent provision of the Social
Security Act or regulations pertaining thereto . . . the
individual, in accepting such overpayment, will be deemed to
be without fault.

20 C.F.R. § 404.510a.

    Furthermore, in such a situation, the regulations direct

that recovery will be waived.  20 C.F.R. § 404.512(a) states:

"[i]n the situations described in § 404.510(a) . . ., adjustment

or recovery will be waived since it will be deemed such

adjustment or recovery is against equity and good conscience."

Thus, someone who relies on erroneous information from an

official source meets both requirements for waiver set forth in

42 U.S.C. § 404(b):  he is without fault, and recovery would be

against equity and good conscience. <u>Gladden v. Callahan</u>, 139

F.3d 1219, 1223 (8th Cir. 1998).

The PASS[8] program to which plaintiff refers is found at 20

C.F.R. § 416.1225 which states:

> If you are blind or disabled, we will pay you SSI benefits
> and will not count resources that you use or set aside to
> use for expenses that we determine to be reasonable and
> necessary to fulfill an approved plan to achieve self-
> support.

20 C.F.R. § 416.1226 describes the process for using the PASS

program:

(a)  A PASS must--

    (1)  Be designed especially for you;

    (2)  Be in writing;

    (3)  Be approved by us (a change of plan must also be
    approved by us);

    (4)  Have a specific employment goal that is feasible
    for you, that is, a goal that you have a
    reasonable likelihood of achieving;

    (5)  Have a plan to reach your employment goal that is
    viable and financially sustainable, that is, the
    plan--

        (I)  Sets forth steps that are attainable in order
        to reach your goal, and

        (ii) Shows that you will have enough money to meet
        your living expenses while setting aside
        income or resources to reach your goal;

---

[8]Plan to Achieve Self Support.

(6) Be limited to one employment goal; however, the employment goal may be modified and any changes related to the modification must be made to the plan;

(7) Show how the employment goal will generate sufficient earnings to substantially reduce your dependence on SSI or eliminate your need for title II disability benefits;

Example 1: A Substantial Reduction Exists. Your SSI monthly payment amount is $101 and your PASS employment goal earnings will reduce your SSI payment by $90. We may consider that to be a substantial reduction.

Example 2: A Substantial Reduction Exists. You receive a title II benefit of $550 and an SSI payment of $73. Your PASS employment goal will result in work over the SGA level that eliminates your title II benefit but increases your SSI payment by $90. We may consider that a substantial reduction because your work will eliminate your title II payment while only slightly increasing your SSI payment.

Example 3: A Substantial Reduction Does Not Exist. Your SSI monthly payment amount is $603 and your PASS employment goal earnings will reduce your SSI payment by $90. We may not consider that to be a substantial reduction.

(8) Contain a beginning date and an ending date to meet your employment goal;

(9) Give target dates for meeting milestones towards your employment goal;

(10) Show what expenses you will have and how they are reasonable and necessary to meet your employment goal;

(11) Show what resources you have and will receive, how you will use them to attain your employment goal, and how you will meet your living expenses; and

(12) Show how the resources you set aside under the
         plan will be kept separate from your other
         resources.

(b) You must propose a reasonable ending date for your
    PASS. If necessary, we can help you establish an ending
    date, which may be different than the ending date you
    propose. Once the ending date is set and you begin your
    PASS, we may adjust or extend the ending date of your
    PASS based on progress towards your goal and earnings
    level reached.

(c) If your employment goal is self-employment, you must
    include a business plan that defines the business,
    provides a marketing strategy, details financial data,
    outlines the operational procedures, and describes the
    management plan.

(d) Your progress will be reviewed at least annually to
    determine if you are following the provisions of your
    plan.

A review of the factors set out in the definition of fault

supports the ALJ's finding that plaintiff was not without fault.

1.   Age.  Plaintiff was 34 years of age when he applied for

benefits.  There is no evidence or argument by plaintiff that his

age had anything to do with his overpayment.

2.   Intelligence.  Plaintiff has a college education.  He

has been able to present this case, both to the ALJ and in

federal court, without the assistance of a lawyer.  The evidence

establishes that plaintiff was able to find and cite to SSA

regulations when he was dealing with SSA staff, and his pleadings

in federal court further establish that he understands the laws

and regulations pertinent to his case.

3. Physical, mental, educational, or linguistic limitations. There is no evidence that any of these factors limited plaintiff's ability to understand or prevent the overpayment he received.

The three ways that a person can be at fault in receiving an overpayment are (1) knowingly making an incorrect statement, (2) knowingly failing to furnish material information, and (3) accepting a payment which he knew or could have been expected to know was incorrect. In this case, the evidence establishes that plaintiff knowingly failed to furnish material information, i.e., the fact that he returned to work, and that he accepted payments which he knew or could have ben expected to know were incorrect.

Plaintiff claimed he did not read his application. Yet he testified that the employee who helped him fill out the application told him to read it and then sign it.[9] Furthermore, failure to read the application does not alleviate a claimant's responsibility of knowing what he has signed. In <u>Chapman v. Bowen</u>, 810 F.2d 151, 152-53 (8th Cir. 1986), the Eighth Circuit pointed out that "[f]or the ALJ to have held otherwise would undermine the integrity of the Social Security program by

---

[9]"I think it was Ms. Larkin, what I see in the report here, he then came back and told her what to sign me up for and then I went into -- she filled, prepared the paperwork, asked me my name and address and social and all that and then printed it all up and then **she told me to, on my application**, as what I understand now, **to go over and read** and make sure all your information is correct **and then sign it.**" (Tr. at 333) (emphasis added).

permitting beneficiaries to ignore reporting requirements by merely stating that they did not read the document they signed." Plaintiff also had experience with disability benefits ending upon a return to work as that is what had happened to him prior to his 2001 application.

Plaintiff admitted he did not report his return to work, and said that he "assumed" SSA would know he was working since he told them when he applied that it was his intention to return to work. Plaintiff was unable to explain to the ALJ how SSA would know when plaintiff returned to work without plaintiff furnishing that information.

Plaintiff evaded SSA's attempts to obtain information about his earnings. He received a work activity report and failed to complete it because he was busy working. He testified he "eventually" filled out the form, but that was not until he had received three of them. Each time, plaintiff went to an SSA office without the paperwork he had received and told the person at the front desk to check and see what information was needed from him. It should have been clear to plaintiff that SSA needed information about his work activity, since they had sent him work activity reports. Instead, plaintiff appears to have feigned ignorance as to the information SSA sought in the hopes that the person at the front desk would not have that information. And indeed that was the case. Additionally, plaintiff chose to go to

three different offices when he was "taking care" of the requests for information, instead of going back to the same office where the employee may have obtained additional information as a result of plaintiff's previous visit.

In 2004, SSA sent plaintiff three letters over a four-month period asking for additional information about the money that had been reported to his earnings record (not by him). Plaintiff was asked to submit a report of work activity and return it to SSA within 15 days. Plaintiff ignored those requests and sent nothing.

After plaintiff was directed to repay the overpayment, he met with Ms. Bischof and failed to complete and return the HA-501 form that had been mailed to him. At the end of his administrative hearing, the judge asked plaintiff to submit an updated income and expenses form; however, he did not submit anything or offer any explanation as to why he had chosen not to comply with the request.

The evidence is overwhelming that plaintiff failed to furnish information which he knew to be material, and that he accepted payments which he knew were incorrect. Therefore, the ALJ's finding that plaintiff is not without fault is supported by the substantial evidence in the record.

*Confusion.*

Plaintiff also argues that he relied on misinformation which, under the regulations, would prevent SSA for collecting the overpayment. Plaintiff was able to identify no "misinformation" but instead claimed that his own confusion constitutes misinformation. First, there is no legal authority for the proposition that a claimant's confusion is the same thing as SSA providing misinformation. Second, plaintiff's claims of confusion are not credible.

Plaintiff claims that he was confused and did not know he was supposed to report a return to work. I agree with the ALJ that there is no plausible evidence that plaintiff was confused about his responsibility to report a return to work:

1.   Plaintiff originally began receiving disability benefits as of January 1988 but then went to college and then returned to the work force. Plaintiff's disability benefits stopped then; therefore, it is not plausible for him to believe that he could subsequently work without notifying SSA and continue to get disability payments.

2.   The application, at page 2, that was signed by plaintiff says very plainly, "I agree to notify the Social Security Administration . . . if I go to work, whether as an employee or a self-employed person." Plaintiff has a college education; there is no reason why a person with plaintiff's level

of education would not be able to understand this statement. When the ALJ asked plaintiff to explain what part of that was confusing to him, he changed his testimony and said that he had not read the application.

3.    Plaintiff claims he thought he was signed up to receive SSI (which, as plaintiff was aware, is a requirement of the PASS plan); however, plaintiff submitted as evidence a letter from SSA which states that the amount of SSI he would be getting each month was "$0.00".

4.    Plaintiff testified that the manager at SSA told plaintiff there was a program where plaintiff could use his benefits "to purchase equipment for a future job."  Yet, plaintiff reported on all of his paperwork and in his testimony that he never used any of his benefits to purchase equipment for a job.[10]

5.    Although plaintiff argued he thought he was enrolled in PASS and could earn as much as he could without losing his disability benefits, he also testified he knew the purpose of the plan was to allow recipients to purchase equipment for a future job.  Plaintiff was asked in his administrative paperwork whether

---

[10]After the fact, he argued that he should be able to exclude the cost of buying a car; however, a car does not qualify.  If he were enrolled in the PASS plan (which he was not), the cost of modifying the car so that he could use it while paralyzed would count; however, plaintiff refused to provide this information to SSA when they requested it.

he spent any money for things or services related to his condition that allowed him to work, and he checked, "no". Therefore, because plaintiff understood that the PASS plan was to allow for job-related purchases, his failure to use any income for job-related purchases is further evidence that plaintiff did not really believe he was enrolled in a plan that would allow him to earn money while collecting disability checks.

6.   In his administrative paperwork, plaintiff denied performing substantial gainful activity, which is inconsistent with his later allegation of confusion over his responsibility to report earnings.

Finally, even though SSA may have been at fault in making the overpayment, that fact does not relieve plaintiff from liability for repayment if he is not without fault.  <u>See</u> 20 C.F.R. § 404.507 ("Although the Administration may have been at fault in making the overpayment, that fact does not relieve the overpaid individual or any other individual from whom the Administration seeks to recover the overpayment from liability for repayment if such individual is not without fault.")

## VI. CONCLUSIONS

Based on all of the above, I find that the ALJ's determination that plaintiff was not without fault in receiving the overpayment is supported by substantial evidence in the record as a whole.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 1, 2010